IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| NANCY LUND, LIESA MONTAG-SIEGEL and ROBERT VOELKER, | ) ) | |
| Plaintiffs, | ) | 1:13CV207 |
| v. | ) ) | |
| ROWAN COUNTY, NORTH CAROLINA, | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

BEATY, District Judge.

This matter is before the Court on the respective Motions for Summary Judgment of Defendant Rowan County [Doc. #51] and Plaintiffs Nancy Lund, Liesa Montag-Siegel, and Robert Voelker [Doc. #52]. The motions are fully briefed and ripe for adjudication. Plaintiffs contend that Defendant's prayer practice is distinguishable from that at issue in Town of Greece v. Galloway, 134 S. Ct. 1811, 188 L. Ed. 2d 835 (2014), and constitutes unconstitutional coercion in violation of the First Amendment's Establishment Clause. Defendant argues that Town of Greece controls and permits its legislative prayer practice. For the reasons discussed below, the Court will grant Plaintiffs' Motion and deny Defendant's Motion.

I.      FACTUAL AND PROCEDURAL BACKGROUND

Nancy Lund, Liesa Montag-Siegel, and Robert Voelker ("Plaintiffs") are residents of Rowan County, North Carolina, and each has attended multiple meetings of the Rowan County Board of Commissioners ("the Board"). Commissioners are elected to the Board, and Defendant Rowan County ("Defendant") exercises its powers as a governmental entity through the Board. The Board usually holds two public meetings per month. From at least November 5, 2007, until the initiation of the present lawsuit in March 2013, the Board regularly opened its

meetings with a Call to Order, an Invocation, and the Pledge of Allegiance, in that order.[1]  Once called to order, the Board Chair typically asked or directed everyone in attendance to stand for the Invocation and Pledge of Allegiance, at which point either the Chairman or another member of the Board would deliver the invocation or prayer.[2]  All of the Commissioners stood for the Invocation and Pledge of Allegiance, and the Commissioners almost always bowed their heads during the Invocation.  Frequently, the prayer-giver would begin the prayer with a phrase such as "let us pray" or "please pray with me."  The majority of the audience members would join the Board in standing and bowing their heads during the prayer. Between November 5, 2007, and the filing of Plaintiffs' Complaint, 139 of 143 Board meetings—in other words, 97%—opened with a Commissioner delivering a sectarian prayer invoking Christianity.  For example, the prayers normally included references to Jesus, the Savior, and other tenets of the Christian faith.

---

[1] In their Verified Complaint [Doc. #1], Plaintiffs cited to and provided the website address for public video recordings of the Board's meetings, which are "available for viewing online through Defendant's website." (Compl. [Doc. #1], at ¶17 & n.2.).  The videos are available for meetings beginning with the November 5, 2007 meeting, and accordingly, Plaintiffs' Verified Complaint describes the Board's practices for meetings held from November 5, 2007 through March 4, 2013, "with the exception of (1) Board meetings that were continued over from a previous meeting that had already been called to order; and (2) the February 8, 2013, joint meeting of the Board of Commissioners and the Rowan-Salisbury School Board of Education, which was conducted pursuant to a unique protocol." (Id. at ¶17 n.2.)  Along with their Verified Complaint and filings regarding a preliminary injunction, Plaintiffs also submitted a transcript of each prayer, as transcribed from viewing the videos. (Pls.' Ex. D [Doc. #6-4].)  Each prayer transcript was also accompanied by the web address of the video from which it was derived. (Id.)  Without exclusively relying on the videos, the Court notes the videos tend to corroborate Plaintiffs' facts as depicted in the Verified Complaint and in their other filings.

[2] Although the agendas and individual Commissioners' affidavits use the word "Invocation," the invocation practice as implemented routinely consists of a prayer.  As such, the Court often uses "prayer" or "legislative prayer" in referring to Defendant's Invocation practice.  Likewise, the Parties' briefings on the matter use invocation and prayer interchangeably.

No invocation delivered since November 5, 2007, referenced a deity specific to a faith other than Christianity.

On February 12, 2012, the American Civil Liberties Union of North Carolina Legal Foundation sent the Board a letter explaining that the sectarian nature of its Invocations violated the First Amendment of the United States Constitution, based on then-governing Fourth Circuit precedent.[3] The letter requested a response indicating the Board's planned course of action, but the Board did not formally respond. However, certain Commissioners did make public statements indicating their intentions to continue delivering Christian invocations at Board meetings. For example, then-Commissioner Carl Ford declared to the local television news, "I will continue to pray in Jesus' name. I am not perfect so I need all the help I can get, and asking for guidance for my decisions from Jesus is the best I, and Rowan County, can ever hope for." (Compl. [Doc. #1], at ¶ 31.) Commissioner Jim Sides stated in an e-mail obtained by local media that he would "continue to pray in JESUS name . . . I volunteer to be the first to go to jail for this cause . . . and if you [Commissioner Mitchell] will [get] my bail in time for the next meeting, I will go again!" (Id.) Commissioner Jim Sides also made other publicly disseminated statements—albeit not specifically regarding objections to the Board's prayer practice—regarding his views on religious minorities: "I am sick and tired of being told by the minority what's best for the majority. My friends, we've come a long way – the wrong way. We call evil good and good evil." (Pls.' Mem. Law Supp. Mot. Summ. J. [Doc. # 53], at 3.)

---

[3] Until the Supreme Court's decision in <u>Town of Greece v. Galloway</u> 134 S. Ct. 1811 (2014), Fourth Circuit precedent held that sectarian legislative prayer was unconstitutional. <u>Joyner v. Forsyth Cnty.</u>, 653 F.3d 341, 349 (4th Cir. 2011).

On March 12, 2013, Plaintiffs filed a Motion for Preliminary Injunction [Doc. #5] and a Verified Complaint [Doc. #1] asserting claims of First Amendment violations against Defendant pursuant to 42 U.S.C. § 1983. Specifically, the Complaint contended that Defendant violated the Establishment Clause by delivering sectarian legislative prayers and by coercing Plaintiffs to participate in religious exercises. Plaintiffs have attended multiple Board meetings at which they have witnessed Commissioners deliver sectarian, Christian-themed prayers. Plaintiffs, none of whom are Christian, each attested to feeling coerced by Defendant's prayer practice. At each meeting attended by Plaintiffs Nancy Lund and Liesa Montag-Siegel, the Board Chair "asked or requested that all stand for the invocation and Pledge of Allegiance," and as a result, "each member of the Board stood as did everyone [they] saw in the audience." (Pls.' Ex. A, Lund Aff. [Doc. #6-1], at ¶ 9; Pls.' Ex. B, Montag-Siegel Aff. [Doc. #6-2], at ¶ 9.) Plaintiff Lund averred that the prayer practice caused her to feel excluded from the community and the local political process, and further, that she felt "compelled to stand so that [she] would not stand out," at the Board meetings. (Pls.' Ex. A, Lund Aff. [Doc. #6-1], at ¶¶ 9-11.) Plaintiff Montag-Siegel likewise objected to the sectarian prayers delivered by the Board, stating that the prayers caused her to feel excluded at meetings, excluded from the community, and coerced into participating in the prayers which were not in adherence with her Jewish faith. Plaintiff Montag-Siegel averred that "the prayers sent a message that the County and Board favors Christians and that non-Christians, like [her], are outsiders." (Pls.' Ex. B, Montag-Siegel Aff. [Doc. #6-2], at ¶ 10.)

Plaintiff Robert Voelker similarly objected to the Board's prayer practice, averring that

the prayers caused him to "feel uncomfortable and excluded from the meeting and the political community," as well as "coerced," and "like an outsider at a governmental meeting." (Pls.' Ex. C, Voelker Aff. [Doc. #6-3], at ¶¶ 9-10.) Plaintiff Voelker further stated that he felt pressured to stand and participate in the prayers because at each meeting he had attended, Commissioners and most audience members stood during the invocation, and he "stood because the Invocation goes directly into the Pledge of Allegiance, for which I feel strongly I need to stand." (Id. at ¶ 7.) Plaintiff Voelker also expressed concern about the sectarian prayer practice at a Board meeting and proposed a non-sectarian prayer that the Board could use instead to open meetings. Plaintiff Voelker now fears "that the [Board]'s clear disagreement with [his] public opposition to sectarian prayer could make [him] a less effective advocate on other issues" he cares about, and that he now "would have to think seriously about whether [he] would speak up out of fear [his] dissent . . . would make [him] a less credible and effective advocate in the eyes of the Rowan County Commissioners." (Id. at ¶ 13.)

The Board's invocation practice was completed according to a long-standing tradition of the Board. The Board has no written policy regarding its legislative prayer practices, but the Commissioners' post-litigation affidavits establish that each Commissioner gave the invocation on a rotating basis. Each Commissioner stated that "[t]he Commission respects the right of any citizen to remain seated or to otherwise disregard the Invocation in a manner that is not disruptive of the proceedings." (Def. Affs. [Docs. #23-1–#23-5], at ¶ 14.) Likewise, the Commissioners all attested to the invocation being given for the benefit of the Board and for the purpose of solemnizing the meetings. The Board, in their respective affidavits, further

5

averred that citizens may leave the room during the Invocation or arrive after the Invocation has been delivered, and that such actions would not impact citizens' rights to participate in the meetings.

Based on then-controlling circuit precedent, this Court granted Plaintiffs' Motion for Preliminary Injunction [Doc. #5] on July 23, 2013. This Court enjoined Defendant from knowingly and/or intentionally delivering or allowing to be delivered sectarian prayers at meetings of the Rowan County Board of Commissioners during pendency of this suit. In the same Memorandum Opinion and Order [Doc. #36], this Court denied Defendant's Motion to Dismiss [Doc. #22] and denied Defendant's Motion to Stay Proceedings [Doc. #30]. On May 5, 2014, the Supreme Court issued its opinion in Town of Greece v. Galloway, 134 S.Ct. 1811, 188 L. Ed. 2d 835 (2014), upholding sectarian legislative prayers as delivered at the Town of Greece's Town Council meetings. On January 20, 2015, the Parties here filed their respective Motions for Summary Judgment, arguing the merits of the present case predominately based upon the holdings of Town of Greece.

## II.  LEGAL STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a court shall grant summary judgment when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 913 (4th Cir. 1997). "In considering a motion for summary judgment, the district court must 'view the evidence in the light most favorable to the' nonmoving party." Jacobs v. N.C. Admin. Office of the Courts, No. 13-2212, 2015 U.S. App. LEXIS 3878, at *12, (4th Cir.

Mar. 12, 2015) (quoting <u>Tolan v. Cotton</u>, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014) (per curiam)).  A court's belief that the movant would prevail on the merits at trial is insufficient to grant a motion for summary judgment.  <u>Jacobs</u>, 2015 U.S. App. LEXIS 3878, at *12.  The court cannot make credibility determinations or weigh evidence, and "must disregard all evidence favorable to the moving party . . . that a jury would not be required to believe."  <u>Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos</u>, 264 F.3d 424, 436 (4th Cir. 2001); <u>see</u> <u>Jacobs</u>, 2015 U.S. App. LEXIS 3878, at *12-13.  However, the party opposing summary judgment may not rest on mere allegations or denials, and the court need not consider "unsupported assertions" or "self-serving opinions without objective corroboration."  <u>Evans v. Techs. Applications & Serv. Co.</u>, 80 F.3d 954, 962 (4th Cir. 1996); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248–49, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

## III.  DISCUSSION

Both Parties contend that no genuine issue of material fact remains for trial, and accordingly, this Court should enter judgment as a matter of law.  The Parties focus their arguments almost exclusively on the rules of legislative prayer espoused in the Supreme Court's recent <u>Town of Greece</u> decision.  However, Defendant also raises a legislative immunity argument.  Thus, the Court must preliminarily consider whether legislative immunity applies in the present situation. To the extent that the Court concludes that legislative immunity does not shield Defendant from the present claims, the Court's analysis will then consider the present facts under the framework provided in <u>Town of Greece</u>.  Furthermore, to the extent the Court concludes that Defendant's present prayer practice falls outside the practice approved of in

7

<u>Town of Greece</u>, the Court will consider whether Defendant's particular practice exercised here is impermissibly coercive in violation of the Establishment Clause.

      A.      Legislative Immunity

      In a lengthy footnote, Defendant suggests that legislative immunity shields the Board from suit based on the prayers given at Board meetings. (Def.'s Br. Supp. Summ. J. [Doc. #54], at 13 n.4.)  Defendant essentially argues that the prayers are a product of the individual Commissioners acting in their legislative capacities, for which they are immune from suit pursuant to the Speech or Debate Clause of the Constitution.  In supporting its Motion to Dismiss [Doc. # 22], Defendant hinted at this argument, positing that "Plaintiffs have sued the wrong Defendant by naming Rowan County. The actions Plaintiffs complain of . . . are entirely the choices of five separate Commissioners acting in their individual . . . capacities." (Def.'s Br. Supp. Mot. Dismiss [Doc. #23], at 1.)  Initially, and as Defendant acknowledges, the Court notes that the defendant in this lawsuit remains only Rowan County, not the individual Commissioners in their official capacities.  This Court, in an Order previously entered, has already rejected Defendant's arguments that municipal liability did not apply, based upon a determination that the actions of the Commissioners constituted a custom or policy attributable to Defendant Rowan County.

      Nonetheless, Defendant asserts that legislative immunity can be applied to the municipality in the present case.  However, Defendant's own arguments and authorities used earlier in this case foreclose this argument.  Defendant cited to <u>Berkley v. Common Council of City of Charleston</u>, 63 F.3d 295, 299 (4th Cir. 1995) (en banc), in arguing for dismissal because

8

the lack of any policy or legislation prevented a finding of municipality liability. Berkley, however, clearly explains how Supreme Court and Fourth Circuit precedent soundly establish that legislative immunity does not apply to municipalities. Id. at 300 ("Our holding today that a municipality does not enjoy immunity with respect to the acts of its legislative body, thus, should come as no surprise."). In a case cited by Defendant in its present argument, Bogan v. Scott-Harris, 523 U.S. 44, 118 S. Ct. 966, 140 L. Ed. 2d 79 (1998), only the individuals in their official capacities were claiming legislative immunity, and only those individual defendants were before the Supreme Court when it determined immunity extended to the officials' actions. Id. 523 U.S. at 47-48 & n.1, 118 S. Ct. 966, 969 & n.1. Thus, while Bogan held that local legislators are entitled to the same legislative immunity as their federal and state counterparts, Bogan did not extend that immunity to a defendant-municipality. Id. at 53 ("Municipalities themselves can be held liable for constitutional violations . . . ."). Municipalities, including the present Defendant, are therefore not accorded legislative immunity. Berkley, 63 F.3d at 296, 300; see Hake v. Carroll Cnty., No. WDQ-13-1312, 2014 U.S. Dist. LEXIS 112572, at *10-11 (D. Md. Aug. 13, 2014) (magistrate judge's recommendation) (rejecting nearly identical argument of legislative immunity for defendant county when county commissioners offered legislative prayers); Doe v. Pittsylvania Cnty., 842 F. Supp. 2d 906, 917-919 (W.D. Va. 2012) (refusing to extend legislative immunity to county board of commissioners because (1) the county and the board were governmental entities not eligible for such immunity and (2) regardless, legislative prayer is not a legitimate legislative activity protected by legislative immunity).

   To the extent Defendant suggests that Defendant is immune because the prayers

constitute speech of the individual Commissioners, such an argument is without merit.  Under Fourth Circuit precedent, the prayers delivered by the Board are government speech, not private speech.  See, e.g., Turner v. City Council, 534 F.3d 352, 354-355 (4th Cir. 2008) (holding that prayers delivered by members of a City Council were government speech and not private speech).  Defendant nonetheless directs the Court to the two-part legislative immunity test of Gravel v. United States, 408 U.S. 606, 625, 92 S. Ct. 2614, 2627, 33 L. Ed. 2d 583 (1972), in applying the protections of the Speech or Debate Clause.  The Board's practices here fail to warrant immunity under Gravel because legislative prayers are not integral to the legislative process, and moreover, the members of the Board are not being sued in their individual capacities.  See Hake, 2014 U.S. Dist. LEXIS 112572, at *10-11; Pittsylvania Cnty., 842 F. Supp. at 917-919.

Gravel itself defined the scope of the Speech or Debate Clause, which Defendant attempts to rely upon, as reaching speech, debate, or conduct that is "an integral part of the deliberative and communicative process by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." Gravel, 408 U.S. at 625, 92 S. Ct. at 2627.  This does not capture every official act of a legislator, "but only [those matters] necessary to prevent indirect impairment of such deliberations." Id. (quotations omitted) (quoting with approval the Court of Appeals's description of the limits of the Speech or Debate Clause); see Roberson v. Mullins, 29 F.3d 132, 135 (4th Cir. 1994) (declaring that function of a local government body is legislative only "when

10

it engages in the process of 'adopting prospective, legislative-type rules.' " (quoting <u>Front Royal</u> <u>& Warren Cnty. Indus. Park Corp. v. Town of Front Royal</u>, 865 F.2d 77, 79 (4th Cir. 1989))).

Legislative bodies can and do successfully function absent a legislative prayer practice. As such, prayer can hardly be considered necessary or integral to local government's legislative processes. <u>See</u> <u>Pittsylvania Cnty.</u>, 842 F. Supp. at 919-20.

Simply stated, Defendant's legislative immunity arguments are inapplicable here, where Plaintiffs claim that the defendant-municipality's practice violated their constitutional rights, and where the activity complained of is not integral to the legislative process. Accordingly, the Court rejects Defendant's legislative immunity argument and next turns to the merits of Plaintiff's claims, that is, whether Defendant's practice is constitutional under recent Supreme Court precedent.

B.    Defendant's Practice as Distinguished from that Approved in <u>Town of Greece</u>

On May 5, 2014, the Supreme Court upheld the invocation practices of the Town of Greece, New York, at its monthly Town Council meetings. <u>Town of Greece,</u> 134 S. Ct. at 1815. In doing so, the Supreme Court clarified its earlier holdings regarding legislative prayer and rejected any requirement that legislative prayers must be neutral in content and invoke only a generic God. <u>Id.</u> at 1821-23. Prior to the Supreme Court's decision in <u>Town of Greece</u>, courts routinely analyzed legislative prayer cases under <u>Marsh v. Chambers</u>, 463 U.S. 783, 103 S. Ct. 3330, 77 L. Ed. 2d 1019 (1983), particularly as discussed in <u>County. of Allegheny v. ACLU</u>, 492 U.S. 573, 603, 109 S. Ct. 3086, 3106, 106 L. Ed. 2d 472 (1989). <u>E.g.,</u> <u>Joyner v. Forsyth Cnty.</u>, 653 F.3d 341, 349 (4th Cir. 2011); <u>Wynne v. Town of Great Falls</u>, 376 F.3d 292, 299 (4th Cir.

11

2004). This Court and the Fourth Circuit interpreted these precedents as establishing that sectarian legislative prayer violated the First Amendment. See, Joyner 653 F.3d at 349. This interpretation was repudiated by the Supreme Court in Town of Greece, thus dismantling the Fourth Circuit's legislative prayer doctrine which developed around the core understanding that the sectarian nature of legislative prayers was largely dispositive of the question of whether there was a constitutional violation.

Town of Greece, however, held that a sectarian legislative prayer does not violate the Establishment Clause, and an otherwise nondiscriminatory practice resulting in one faith dominating the legislative prayer practice likewise does not create an Establishment Clause violation. Town of Greece, 134 S. Ct. at 1823-24. However, this pronouncement does not end the constitutional inquiry regarding the present controversy. The Supreme Court has consistently remarked that Establishment Clause questions are inherently fact-intensive, requiring a thorough examination of all relevant details. See, e.g., id, 134 S. Ct. at 1825 (plurality opinion) (stating in coercion context that "the inquiry remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed"); McCreary Cnty., Kentucky v. ACLU of Kentucky, 545 U.S. 844, 867, 125 S. Ct. 2722, 2738, 162 L. Ed. 2d 729 (2005) ("[U]nder the Establishment Clause detail is key."); Santa Fe Indep. Sch. Dist. v. Doe, 530 U.S. 290, 315, 120 S. Ct. 2266, 2282, 147 L. Ed. 2d 295 (2000) ("Whether a government activity violates the Establishment Clause is 'in large part a legal question to be answered on the basis of judicial interpretation of social facts . . . . Every government practice must be judged in its unique circumstances . . . .' " (quoting Lynch v. Donnelly, 465 U.S. 668, 693-94, 104 S. Ct.

12

1355, 1370, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring))); Lee v. Weisman, 505 U.S. 577, 597, 112 S. Ct. 2649, 2660-61 120 L. Ed. 2d 467 (1992) ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one . . . ."). Likewise, in both Marsh and Town of Greece, the Supreme Court emphasized the importance of the specific factual contours of the historical tradition of legislative prayer. See Town of Greece, 134 S. Ct. at 1819 ("Marsh stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted."); Marsh, 463 U.S. at 791, 103 S. Ct. at 3335 (relying on "unique history" of Congress's "practice of prayer similar to that" at issue in Marsh). Because of the factually-demanding nature of Establishment Clause questions, and because the legislative prayer permitted under the Establishment Clause represents a narrow rule in First Amendment jurisprudence, the facts before the Supreme Court in Town of Greece are particularly relevant to this Court's analysis. As such, a review of Town of Greece is necessary in order to carefully evaluate the constitutionality of Defendant's prayer practice based upon the facts before this Court.

1.     Facts of Town Town of Greece

The Town of Greece held monthly town meetings, and since 1999, had opened its meetings with a roll call followed by the Pledge of Allegiance and a prayer delivered by a local clergyman. Town of Greece, 134 S. Ct. at 1816. As explained in the Supreme Court's opinion:

> The town followed an informal method for selecting prayer givers, all of whom were unpaid volunteers. A town employee would call the congregations listed in a local directory until she found a minister available for that month's meeting. The town eventually compiled a list of willing "board chaplains" who had accepted invitations and agreed to return in the future. The town at no point excluded or denied an opportunity to a would-be prayer giver. Its leaders

13

maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation. But nearly all of the congregations in town were Christian; and from 1999 to 2007, all of the participating ministers were too.

Id. at 1816. The town did not review the content of any prayers. Id. Two citizens attended town board meetings and "complained that Christian themes pervaded the prayers, to the exclusion of citizens who did not share those beliefs." Id. at 1817. This prompted the town board to invite a Jewish layman and the chairman of a Baha'i temple to deliver prayers at meetings; moreover, a Wiccan priestess who learned about the prayer practice contacted the town board about delivering the prayer and was granted an opportunity to do so. Id. The two citizens filed suit challenging the prayer practices of the town, arguing that the practice impermissibly sponsored sectarian prayer and preferred Christian prayer-givers over others. Id.

The Supreme Court rejected the argument that only nonsectarian, or "generic" legislative prayers comport with the First Amendment. Id. at 1820-21. The Supreme Court observed that this mistaken belief that prayer must be nonsectarian "derives from dictum in County of Allegheny, 492 U.S. 573, 109 S. Ct. 3086, that was disputed when written and has been repudiated by later cases." Id. at 1821. "Marsh nowhere suggested that the constitutionality of legislative prayer turns on the neutrality of its content." Id. The Supreme Court reinforced that legislative prayer has a robust history and serves to solemnize legislative proceedings. Id. at 1823; see Marsh, 463 U.S. at 786, 103 S. Ct. at 3333. The Supreme Court incorporated and added to its observations from Marsh establishing legislative prayers' historical mooring. Id. at 1818-19. "That the First Congress provided for the appointment of chaplains only days after approving language for the First Amendment demonstrates that the Framers considered

14

legislative prayer a benign acknowledgment of religion's role in society." Id. at 1819; see also Marsh 463 U.S. at 787-90; 103 S. Ct. at 3333-35 (discussing practices of Congress and state legislatures in having paid chaplains provide legislative prayers). The Supreme Court highlighted that sectarian prayers were in accord with the "tradition of legislative prayer outlined in the Court's cases," pointing to the example of a Christian prayer delivered by one of the U.S. Senate's first chaplains, and Congress's continued practice of permitting its "chaplains to express themselves in a religious idiom." Town of Greece, 134 S. Ct. at 1820

Thus, Town of Greece held that sectarian legislative prayer does not run afoul of the Establishment Clause. However, the Court indicated some limits to this holding, deriving from the purpose of legislative prayer "to lend gravity to the occasion" so as to "invite[] lawmakers to reflect upon shared ideals and common ends." Id. As such, the Supreme Court highlighted an exception when legislative prayer may be unconstitutional: "If the course and practice over time shows that the invocations denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion, many present may consider the prayer to fall short of the desire to elevate the purpose of the occasion and unite lawmakers in their common effort." Id. "Prayer that reflects beliefs specific to only some creeds can still serve to solemnize the occasion, so long as the practice over time is not 'exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" Id. (quoting Marsh, 463 U.S. at 794-95, 103 S. Ct. 3330). The Supreme Court determined that the facts disclosed in Town of Greece did not constitute any such pattern of denigration or proselytization. Id.

The Supreme Court also upheld the Town of Greece's policy and procedure for selecting

prayer-givers, even though that process resulted in a majority of Christian-themed prayers led by Christian ministers. Id. at 1824. "That nearly all of the congregations in town turned out to be Christian does not reflect an aversion or bias on the part of town leaders against minority faiths." Id. In making this determination, the Supreme Court emphasized the town's willingness to welcome a prayer delivered by any religious leader or layperson. Id. "So long as the town maintains a policy of nondiscrimination, the Constitution does not require it to search beyond its borders for non-Christian prayer givers in an effort to achieve religious balancing." Id.; see also id. at 1820-21 ("[Congress] acknowledges our growing diversity not by proscribing sectarian content but by welcoming ministers of many creeds.") This cautionary language was not elaborated upon by the Town of Greece Court, aside from rejecting any requirement that the town achieve a particular level of religious diversity or balancing of views in its invocations. Id. Such efforts could foster governmental entanglement with religion. Id.

In declaring sectarian legislative prayer constitutional, the Supreme Court relied on the specific history of legislative prayer practices, as it had done in Marsh. Based on the long history of legislative prayer as practiced by the First Congress and early state legislatures, and continuing to the present day, the practice of the Town of Greece was constitutional—even when an appointed or volunteer chaplain gave a sectarian prayer. Turning to the case at hand, the "inquiry . . . must be to determine whether the prayer practice [of Defendant] fits within the tradition long followed in Congress and the state legislatures." Id. at 1819.

2.      Notable Differences Here from Town of Greece

In considering the present matter, the Court is guided by the significance the Supreme

16

Court attributed to the historical legislative prayer practice recognized by the Founders and continued by Congress to the present day. Likewise, the Court considers the "constraints" the Supreme Court recognized in upholding sectarian legislative prayer—namely, the purpose of the prayer to solemnize legislative proceedings, and that the particular prayer practice does not advance, proselytize, disparage, or denigrate any religion. In other words, the legislative prayer practice must fit within this Nation's long-standing tradition of legislative prayer in a manner that does not over time have the effect of promoting or disparaging any given religion, and instead unites lawmakers in a moment of solemnity.

The crucial question in comparing the present case with Town of Greece is the significance of the identity of the prayer-giver, either as a member of the legislative body or a non-member of the legislative body. In the present matter, the Commissioners themselves—and only the Commissioners—delivered the prayers at the Board's meetings. In contrast, the Town of Greece invited volunteers from a variety of religious faiths to provide the prayers. After careful consideration, this Court concludes that this distinction matters under the Establishment Clause.

As Defendant asserts, the Supreme Court did not explicitly premise its decision on the fact that the Town Council members were not the ones giving the prayers.[4] However, it is

---

[4] Defendant points to this Court's observation in an earlier case regarding sectarian prayer to support its proposition that Commissioners can provide legislative prayers. See Joyner v. Forsyth Cnty., No. 1:07CV243, Order, at 4 (Jan. 28, 2010) (identifying legislative prayer options for Forsyth County Board of Commissioners, including possibility of board members offering *nonsectarian* prayers). However, this Court's previous decision was issued prior to Town of Greece and was premised on the sectarian nature of the prayers in that case under now-abrogated Fourth Circuit precedent. Additionally, the Court notes that the Commissioners' provision of prayers is not *per se* unconstitutional. The prayer-givers' identities are significant

telling that throughout its <u>Town of Greece</u> opinion and the opinion in <u>Marsh</u>, the Supreme Court consistently discussed legislative prayer practices in terms of invited ministers, clergy, or volunteers providing the prayer, and not once described a situation in which the legislators themselves gave the invocation. <u>See</u> <u>e.g.</u>, <u>Town of Greece</u>, 134 S. Ct. at 1822 ("The law and the Court could not draw this line for each specific prayer or seek to require *ministers* to set aside their . . . personal beliefs . . . .") (emphasis added)  <u>id.</u> at 1823 ("The tradition reflected in Marsh permits *chaplains* to ask their own God for blessings . . . .") (emphasis added).  Likewise, when recounting the historical practice of legislative prayer, the Supreme Court pointed to how "the First Congress provided for the *appointment of chaplains* only days after approving language for the First Amendment" as evidence that this practice of legislative prayer was constitutional.  <u>Id.</u> at 1819 (emphasis added); <u>see</u> <u>also</u> <u>Marsh</u>, 463 U.S. at 788, 103 S. Ct. at 3334 ("Clearly the men who wrote the First Amendment Religion Clause did not view *paid legislative chaplains* and opening prayers as a violation of that Amendment . . . .").  Thus, either the Supreme Court carefully limited its analysis in <u>Town of Greece</u> and approval of legislative prayer to instances in which the prayer-giver is an individual separate from the deliberative body, or the Supreme Court simply did not consider the issue of whether a legislator-as-prayer-giver would comport with historical traditions.[5]  Either way, <u>Town of Greece</u> and <u>Marsh</u> thus do not squarely approve of

---

here in relation to the surrounding circumstances.  Under a different, inclusive prayer practice, Commissioners might be able to provide prayers, but that is not the case before the Court.

[5] Defendant argues that in approving of the Nebraska legislature's appointment of a paid chaplain position, the Supreme Court in <u>Marsh</u> approved of government officials providing prayers, which would extend to the Commissioners as government officials.  Defendant's argument misconstrues <u>Marsh</u> and misconceives the role of a legislator.  To say that <u>Marsh</u> held that any person drawing a paycheck from the government is eligible to deliver a legislative prayer

18

the practice at issue here, which deviates from the long-standing history and tradition of a chaplain, separate from the legislative body, delivering the prayer. <u>Town of Greece</u>, 134 S. Ct. at 1819 ("<u>Marsh</u> stands for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practices is permitted."); <u>c.f.</u> <u>North Carolina Civil Liberties Union Legal Found. v. Constangy</u>, 947 F.2d 1145, 1149 (4th Cir. 1991) (observing in case where judge routinely opened court by delivering a prayer that judge acts as the court itself, and accordingly, "[f]or a judge to engage in prayer in court entangles governmental and religious functions to a much greater degree than a chaplain praying before the legislature").

The <u>Town of Greece</u> Court's concern with government involvement in legislative prayer practices underscores the constitutional dilemma posed by legislators acting as prayer-givers. <u>Town of Greece</u> reasoned that requiring prayers to be nonsectarian would "force the legislatures that sponsor prayers . . . to act as supervisors and censors of religious speech, a rule that would involve government in religious matters to a far greater degree than is the case under the town's current practice of neither editing or approving prayers in advance nor criticizing their content after the fact." <u>Town of Greece</u>, 134 S. Ct. at 1821. Where the Commissioners themselves are the ones giving the prayer, they are by default acting as "supervisors" of the prayers, and are themselves "editing [and] approving prayers" as they simultaneously deliver those prayers. In the same discussion of government involvement in prayers, the Supreme Court continued by

---

ignores the specific history of legislative prayer. It also ignores that legislators, unlike an appointed or volunteer chaplain, are elected decisionmakers who deliberate within the legislative body to whom the prayers are allegedly directed. An appointed chaplain possesses no such legislative, policy-making power.

reinforcing that "[o]ur Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior." (citing Engel v. Vitale, 370 U.S. 421, 430, 82 S. Ct. 1261, 1266, 8 L. Ed. 2d 601 (1962)). Under the Board's practice, the government is delivering prayers that were exclusively prepared and controlled by the government, constituting a much greater and more intimate government involvement in the prayer practice than that at issue in Town of Greece or Marsh. The Commissioners here cannot separate themselves from the government in this instance.

Additionally, because of the prayer practice's exclusive nature, that is, being delivered solely by the Commissioners, the prayer practice cannot be said to be nondiscriminatory. The need for the prayer policy to be nondiscriminatory was one of the characteristics key to the constitutionality of the Town of Greece's practice. Town of Greece, 134 S. Ct. at 1824. Instead, the present case presents a closed-universe of prayer-givers, that being the Commissioners themselves, who favored religious beliefs believed to be common to the majority of voters in Rowan County. While an all-comers policy is not necessarily required, a nondiscriminatory one is. When all faiths but those of the five elected Commissioners are excluded, the policy inherently discriminates and disfavors religious minorities. That some day a believer in a minority faith could be elected does not remedy that until then, minority faiths have no means of being recognized. When only the faiths of the five Commissioners are represented, the Board "reflect[s] an aversion or bias on the part of [county] leaders against minority faiths," namely, any faith not held by one of the Commissioners. See id. Such a system is in stark contrast with the policy at issue in Town of Greece, where a follower of any faith, including members of the

20

general public, were welcome to deliver the prayer at town council meetings.

The observations of one district court regarding a case similar to the present matter, while not binding on this Court, provide further persuasive support for this Court's conclusions. In considering the possibility[6] of modifying an injunction against the Pittsylvania County Board of Supervisors, the district court noted that, like in this case, the "Board members themselves served as exclusive prayer providers," and thus "persons of other faith traditions had no opportunity to offer invocations." Hudson v. Pittsylvania Cnty., No. 4:11cv043, 2014 U.S. Dist. LEXIS 106401, at *5 (W.D. Va. Aug. 4, 2014). The board in Hudson also "directed the assembled citizens to participate in the prayers by asking them to stand." Id. at *6. Based on these details—which parallel those presently before this Court—the Hudson district court concluded "the active role of the Pittsylvania County Board of Supervisors in leading the prayers, and, importantly, dictating their content, is of constitutional dimension and falls outside of the prayer practices approved in Town of Greece." Id. at *6-7.

The prayer practice of Defendant likewise fails to comport with the tradition and purposes embodied in the Town of Greece decision. Several significant differences distinguish the constitutional, historically-rooted legislative prayer of Town of Greece and Marsh from the

---

[6] The district court issued its short memorandum opinion while the merits of the original case and an attorney's fees issue were on appeal to the Fourth Circuit. Hudson, 2014 U.S. Dist. LEXIS 106401, at *7. Thus, the district court's opinion was an indication of how it was inclined to rule on the Motion for Relief before it, but the Court was unable to issue an Order modifying the injunction during the pendency of the appeal. Id. Subsequently, on October 28, 2014, the Fourth Circuit addressed the attorney's fees issue before it, but determined it lacked jurisdiction to consider the merits of the district court's earlier judgment. See Hudson v. Pittsylvania Cnty., 774 F.3d 231, 233-34 & n.2 (4th Cir. 2014). The Fourth Circuit explicitly recognized that it did not consider the Town of Greece decision as applied to the facts of Hudson. Id. at 234 n.2.

present case. These determinative differences include that the legislators themselves—the Commissioners—deliver the prayers. The Commissioners are the solely eligible prayer-givers and provide prayers according to their personal faiths,[7] which have overwhelmingly been Christian. The prayers are thus effectively being delivered by the government itself. Such distinctions implicate the cautionary words in <u>Town of Greece</u>. The Board's practice fails to be nondiscriminatory, entangles government with religion, and over time, establishes a pattern of prayers that tends to advance the Christian faith of the elected Commissioners at the expense of any religious affiliation unrepresented by the majority.

C.     Establishment Clause Coercion Analysis

As detailed above, the prayer practices of Defendant do not "fit[] within the tradition long followed in Congress and the state legislatures," <u>Town of Greece</u>, 134 S .Ct. at 1820, and thus cannot be constitutional by virtue of legislative prayer's history. Accordingly, the Court must next turn to whether the practice, as not fitting within the legislative prayer exception, constitutes an unconstitutional establishment of religion. Specifically, Plaintiffs argue that Defendant's specific practice of opening Board meetings with a Commissioner-led prayer violates the Establishment Clause as a coercive religious exercise.

This Court is mindful that the Fourth Circuit has "emphasized that the <u>Lemon</u> test guides our analysis of Establishment Clause challenges." <u>Mellen v. Bunting</u>, 327 F.3d 355, 370-371 (4th Cir. 2003); <u>Koenick v. Felton</u>, 190 F.3d 259, 264-265 & n.4 (4th Cir. 1999)

---

[7] The Court acknowledges that after initiation of the present lawsuit, then-Commissioner Coltrain offered a moment of "silent prayer" at two meetings instead of delivering sectarian prayers. However, those two isolated prayers do not negate the overwhelming pattern and practice of the Board, which the Board seems prepared to return to.

22

(acknowledging "the Supreme Court has employed several different tests presented as either glosses or replacements for the <u>Lemon</u> test" but determining that courts must rely on <u>Lemon</u>'s principles until overruled). The <u>Lemon</u> test requires a government action to satisfy three conditions: "First, the [governmental act] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [governmental act] must not foster an excessive government entanglement with religion." <u>Lemon v. Kurtzman</u>, 403 U.S. 602, 612-13; 91 S. Ct. 2105, 2111, 29 L. Ed. 2d 745 (1971) (internal citations and quotations omitted); <u>see</u> <u>Lambeth v. Bd. of Comm'rs</u>, 407 F.3d 266, 269 (4th Cir. 2005) (reciting <u>Lemon</u> factors and noting incorporation of "endorsement" test under <u>Lemon</u>'s second prong).

The relationship between the <u>Lemon</u> test and coercion doctrine remains unclear. <u>See</u> <u>Mellen</u>, 327 F.3d at 370-71; <u>Doe v. Elmbrook Sch. Dist.</u>, 687 F.3d 840, 850 (7th Cir. 2012) (en banc) ("Where the coercion test belongs in relation to the Lemon test is less clear."), <u>cert. denied</u>, 134 S. Ct. 2283, 189 L. Ed. 2d 795 (2014). Neither party cites to <u>Lemon</u> as relevant on the present facts. However, as some courts have observed, if a government act would fail the coercion test, it would almost necessarily fail under the second, "effects" prong of <u>Lemon</u>. <u>E.g.</u> <u>Gray v. Johnson</u>, 436 F. Supp. 2d 795, 799 n.4 (W.D. Va. 2006); <u>Nusbaum v. Terrangi</u>, 210 F. Supp. 2d 784, 788 (E.D. Va. 2002) ("[W]here coercion is present, the program will inevitably fail the Lemon test."); <u>Ross v. Keelings</u>, 2 F. Supp. 2d 810, 817 (E.D. Va. 1998) ("[A]s a practical matter, a per se rule focusing on coercion is a permissible substitute for the traditional <u>Lemon</u> test in this context because the mere fact that coercion is exerted by the state is enough to fail

23

the second prong of the test."). This appears true here: If Defendant's prayer practice unconstitutionally coerces Plaintiffs into religious exercises, then the practice would almost certainly have the effect of advancing religion. See Lemon, 403 U.S. at 612-13; 91 S. Ct. at 2111; Lambeth, 407 F.3d at 269; see also Mellen, 327 F.3d at 372 (4th Cir. 2003) (determining, after finding prayer practice coercive, that "in sponsoring an official prayer, VMI has plainly violated Lemon's second and third prongs"). Insomuch as the Parties have limited their argument to coercion, and have not raised Lemon, the Court will limit its review to whether the practice is unconstitutionally coercive. Nonetheless, the Court notes that if the prayer practice is coercive, then it would necessarily advance religion in violation of the second Lemon prong.[8]

     1.  The Town of Greece Plurality's Coercion Analysis

   In advancing their respective arguments regarding coercion, both Plaintiffs and Defendant rely on Justice Kennedy's opinion in Town of Greece. In a footnote, Defendant declares that Justice Kennedy's plurality opinion as to the coercion analysis is binding law. Defendant offers no explanation or analysis for this aside from a naked citation to the Fourth Circuit case A.T. Massey Coal Co. v. Massanari, 305 F.3d 226, 236 (4th Cir. 2002). Massanari cites to and explains the Supreme Court's rule in Marks v. United States, 430 U.S. 188, 97 S. Ct. 990, 51 L. Ed. 2d 260 (1977), that in a Supreme Court decision lacking a majority opinion, "the judgment on the 'narrowest grounds' is to be regarded as the Court's holding." Massanari, 305

---

[8] The Court also notes that there are serious questions of whether the practice might violate the other two Lemon prongs, particularly the third prong regarding excessive government entanglement with religion. Indeed, as is relevant here, the majority opinion in Town of Greece evoked this prong of Lemon in expressing concerns with government control over prayer content and prayer procedures. See Town of Greece, 134 S. Ct. at 1822, 1824.

F.3d at 236 (quoting <u>Marks</u>, 430 U.S. at 193, 97 S. Ct. at 993). "The <u>Marks</u> rule does not apply, however, unless 'the narrowest opinion represents a common denominator of the Court's reasoning and embodies a position implicitly approved by at least five Justices who support the judgment.' " <u>Id.</u> (quoting <u>Ass'n of Bituminous Contractors, Inc. v. Apfel</u>, 156 F.3d 1246, 1254 (D.C. Cir. 1998) (internal quotations omitted)); <u>see also</u> <u>United States v. Abdulwahab</u>, 715 F.3d 521, 530 (4th Cir. 2013) ("[I]n the case of a plurality opinion, the holding of the Court is the narrowest holding that garnered five votes." (citing <u>United States v. Halstead</u>, 634 F.3d 270, 277 (4th Cir. 2011)).

On the facts presented in <u>Town of Greece</u>, five Justices concurred that unconstitutional coercion did not occur. Justice Kennedy, joined by Chief Justice Roberts and Justice Alito, reached this conclusion by noting that whether citizens were "compelled . . . to engage in a religious observance" is a fact-intensive inquiry that "considers both the setting in which the prayer arises and the audience to whom it is directed." <u>Town of Greece</u>, 134 S. Ct. at 1825 (plurality opinion). The history and tradition of legislative prayer is relevant in the coercion context as well, according to Justice Kennedy, and the "reasonable observer" is presumed to be aware of that history and recognize the purpose of such practices. <u>Id.</u> at 1826. Justice Kennedy provided examples of when a legislative prayer practice might cross the constitutional line, such as "if town board members directed the public to participate in the prayers, singled out dissidents for opprobrium, or indicated that their decisions might be influenced by a person's acquiescence in the prayer opportunity." <u>Id.</u> Justice Kennedy continued by observing that "a practice that classified citizens based on their religious views would violate the Constitution, but

25

that is not the case before this Court." Id.

In contrast, Justices Thomas and Scalia would require coercion to consist of being " 'by force of law and threat of penalty,' " according to their understanding of "coercive state establishments that existed at the founding." Id. at 1837 (Thomas, J., concurring in part and concurring in the judgment) (quoting Lee v. Weisman, 505 U.S. 577, 640, 112 S. Ct. 2649, 120 L. Ed. 2d 467 (1992) (Scalia, J., dissenting)). Justice Thomas summarized this view and its relevance to the facts of Town of Greece by stating "to the extent coercion is relevant to the Establishment Clause analysis, it is actual legal coercion that counts—not the 'subtle coercive pressures' allegedly felt by respondents in this case." Id. at 1838. Nonetheless, Justice Thomas and Justice Scalia agreed with Justice Kennedy's plurality analysis that an individual taking or finding offense from the activity does not constitute coercion, "and an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum." Id. (quotations and citations omitted).

Thus, five Justices agreed that the Town of Greece did not engage in an unconstitutionally coercive practice in how it implemented its opening prayer practice. Those five Justices likewise agreed that offense or a sense of affront due to exposure to "contrary religious views in a legislative forum" does not constitute coercion. Id. at 1838; id. at 1826 (plurality opinion). The plurality opinion's fact-dependent inquiry and its examples of when "the analysis would be different" and Justice Thomas's concurrence's legal coercion standard provide suggestions of when coercion might occur, but neither can be said to constitute a definitive holding. In other words, "the narrowest holding that garnered five votes," Halstead, 634 F.3d

26

at 277, is that the specific circumstances of <u>Town of Greece</u>, including the plaintiffs' offense at the prayer practice, did not rise to the level of unconstitutional coercion. <u>Town of Greece</u> simply gives one situation that does not constitute coercion, but does not conclusively declare when legislative prayer might constitute coercion.

Even though the plurality's coercion analysis represented the views of only three Justices, the Court considers it persuasive to the extent it provides some possible guiding principles for applying the coercion doctrine in the context of legislative prayer. See <u>Myers v. Loudoun Cnty. Pub. Schs.</u>, 418 F.3d 395, 406 (4th Cir. 2005) ("Although we are not bound by dicta or separate opinions of the Supreme Court, 'observations by the Court, interpreting the First Amendment and clarifying the application of its Establishment Clause jurisprudence, constitute the sort of dicta that has considerable persuasive value in the inferior courts.' " (quoting <u>Lambeth</u>, 407 F.3d at 271 (4th Cir. 2005)). In rejecting the plaintiffs' coercion argument, the plurality emphasized the inclusive nature of the town's policy and that a variety of invited clergy delivered the prayers in question. <u>Town of Greece</u>, 134 S. Ct. at 1827 (plurality opinion). As noted above, the plurality expressed doubt as to the constitutionality of situations where town leaders were to solicit gestures of religious observance from the public audience, or direct them to join in the prayers. The plurality framed the inquiry as fact-dependent, including the setting and the audience to whom the prayers are directed. <u>Town of Greece</u>, 134 S. Ct. at 1825 (plurality opinion)

Applying the plurality's analysis here suggests that Defendant's practice constituted unconstitutional coercion in violation of the Establishment Clause. The undisputed facts establish that a Commissioner always provided the opening prayer, and almost always did so by

delivering an exclusively Christian prayer. C.f. id. at 1826 (observing that "an Establishment Clause violation is not made out any time a person experiences a sense of affront from the expression of contrary religious views in a legislative forum, *especially where, as here, any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions*" (emphasis added)). The Board Chair here would regularly ask that everyone stand for the prayer and the Pledge of Allegiance. Then, the designated prayer-giving Commissioner would often open the prayer by saying such phrases as "let us pray," or "please pray with me." Because no one other than the Commissioners provided the prayers, the prayers repeatedly and exclusively advanced only the faiths of the five Commissioners.

That the Commissioners themselves, and not a volunteer minister without community policy-making power, issued such directives is significant. See Town of Greece, 134 S. Ct. at 1826. The Commissioners "directed the public to participate in the prayers" by asking them to stand for and join in the prayer. See id. Although Defendant argues that the prayers are offered solely for the benefit of the Board, that the Board signaled for the public to join in the prayers undercuts such an argument. Defendant likewise suggests that the Commissioners' statements are mere invitations to stand, and do not rise to the level of a command as Defendant apparently reads Town of Greece to require. Plaintiffs respond that Defendant attempts to substitute the word "command" and a corresponding implication of possible penalties with Town of Greece's actual phraseology, which consisted of variations of the words ask, request, solicit, and direct. As Plaintiff argues, the Town of Greece plurality did not premise its definitions of "soliciting" or "directing" on a threat of penalty and never used the word "command." Here, the Board's

28

statements fall squarely within the realm of soliciting, asking, requesting, or directing, and thus within the territory of concern to the <u>Town of Greece</u> plurality. Even if the Board's statements were mere invitations, and if that distinction mattered, an invitation from a government authority issued to the public often carries more weight and an expectation of compliance than other invitations. For example, when a government official states at a public meeting, "If you would come to order," or "Please be quiet," few, if any, would consider such requests to be mere invitations which could be ignored.

While Defendant asserts that members of the public do not have to participate in the prayers and may leave the room or remain seated without consequence, Defendant relies on the post-litigation affidavits of the individual Commissioners in making such claims. (<u>See</u> Def.'s Resp. Pls.' Cross M. for Summ. J. [Doc. #55], at 2.) The affidavits fail to demonstrate that the attending public is ever made aware of such options, particularly when the public only hears phrases instructing everyone to stand and join in prayer, and not any statements indicating that public attendees need not do so. Indeed, Defendant does not contend or provide evidence that the Board did not actually solicit the public to stand and join in prayer on those occasions discussed by Plaintiffs in their Verified Complaint and Affidavits.[9] To the extent that Defendant attempts to provide post-lawsuit disclaimers that were never communicated to the public, such evidence does not demonstrate that the public knew they could leave or refrain from participating. In sum, that the Commissioners personally held such beliefs about the public's

---

[9] To the extent the online, public videos of the Board meetings, as incorporated by reference in Plaintiffs' Verified Complaint and Exhibit D, are considered, such videos would foreclose any such refutation by Defendant.

participation in prayers does not alter the atmosphere and context in which the prayers were given and received by the public.

The individual Commissioners' statements to news media enhance the coercive setting and further demonstrate that the prayers were for the benefit of the public, as well as the Board. For example, Commissioner Jon Barber, in professing his adamant opposition to changing the Board's prayer practice, was quoted by the local newspaper as saying that the practice "has been a tradition for the board, for our citizens and for our country." (See Pls.' Ex. 2 [Doc. #53-2], at 1.) The same newspaper article quoted then-Chairman Chad Mitchell as being in favor of fighting the present litigation "because it's not just fighting for these five people's rights but for all the citizens of Rowan County." (Id. at 2.) Former Commissioner Carl Ford professed that "asking for guidance for my decisions from Jesus is the best I, and Rowan County, can ever hope for." These statements, along with the previously-mentioned statement by Commissioner Sides indicating his frustration and disapproval with minority religions, demonstrate that Commissioners do not consider the prayer practice as an internal act directed at one another, but rather, that it is also directed toward citizens and for the benefit of all of Rowan County.

The Commissioners' statements also develop the atmosphere of coercion surrounding Board meetings. To the extent that "[i]t is presumed that the reasonable observer is acquainted with this tradition" of legislative prayer, a reasonable observer would likewise be aware of such public statements made by Commissioners outside of meetings. Town of Greece, 134 S. Ct. at 1826 (plurality opinion). The public statements attributed to the Commissioners indicate that at least some of the Commissioners have a preference for Christianity, and that they perceive

the prayer practice as being for the benefit of the citizens of Rowan County, not just for themselves. Likewise, many members of the public appear to view the prayers as being for public consumption, as indicated by the audience's booing and jeering of an individual who expressed opposition to the Board's prayer practice (Compl. [Doc. #1], at ¶ 32.) While the audience's reaction cannot be directly attributed to the Board, the audience's jeering further develops the context and atmosphere of Board meetings, which in turn places additional pressure on Plaintiffs to conform.

Insomuch as the coercion analysis in the Town of Greece plurality opinion is persuasive authority, the opinion in Town of Greece places this case more toward the coercive end of the spectrum than toward the constitutional practice at issue in Town of Greece. Justice Kennedy's general rules for evaluating potential coercion in the legislative prayer context, particularly the examples he identified as being problematic, and the inclusive characteristics of the Town of Greece's practice that he emphasized, point the Court in the direction of finding the practice of Defendant unconstitutionally coercive. However, because the plurality's coercion analysis does not constitute binding precedent, the Court must next consider the coercion doctrine as developed prior to Town of Greece.

2. General Principles of the Coercion Doctrine Pre-Town of Greece

Having reviewed the Town of Greece plurality's coercion analysis, the Court turns to the principles of coercion doctrine developed prior to the Town of Greece decision. Although the Parties rest their coercion arguments on Town of Greece, the Court will consider the background of coercion cases in addressing the present matter, since the coercion analysis in

31

<u>Town of Greece</u> is not a majority opinion of the Supreme Court.

Outside of the legislative prayer context, the Supreme Court and Fourth Circuit have found certain practices unconstitutionally coercive under the Establishment Clause, and have accordingly developed guiding principles for such fact-sensitive inquiries. The coercion doctrine prohibits the government from engaging in actions that coerce citizens to engage in religious conduct. "It is beyond dispute that, at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise, or otherwise act in a way which 'establishes a [state] religion or religious faith, or tends to do so.'" <u>Lee v. Weisman</u>, 505 U.S. 577, 587, 112 S. Ct. 2649, 2655, 120 L. Ed. 2d 467 (U.S. 1992) (quoting <u>Lynch v. Donnelly</u>, 465 U.S. 668, 678, 104 S. Ct. 1355, 79 l. Ed. 2d 604 (1984)); <u>see</u> <u>Santa Fe Indep. Sch. Dist. v. Doe</u>, 530 U.S. 290, 312, 120 S. Ct. 2266, 2280-81, 147 L. Ed. 2d 295 (2000). As the Fourth Circuit explained, "indirect coercion may be unconstitutional when government orchestrates 'the performance of a formal religious exercise' in a fashion that practically obliges the involvement of non-participants." <u>Myers</u>, 418 F.3d at 406 (quoting <u>Lee</u>, 505 U.S. at 586). Coercion analysis is also concerned with the possibility of majority viewpoint dominance over minority viewpoints in a manner that thrusts majoritarian views upon the minority. <u>See</u> <u>Santa Fe</u>, 530 U.S. at 304, 310, 120 S. Ct. at 2276, 2279-80 ("The majoritarian process implemented by the District guarantees, by definition, that minority candidates will never prevail and that their views will be effectively silenced."); <u>Engel v. Vitale</u>, 370 U.S. 421, 430-431, 82 S. Ct. 1261, 1267, 8 L. Ed. 2d 601 (1962) ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities

to conform to the prevailing officially approved religion is plain."); see also Wallace v. Jaffree, 472 U.S. 38, 60 n.51, 105 S. Ct. 2479, 2492 n.51, 86 L. Ed. 2d 29 (1985) (quoting Engle and noting that the impact of "indirect coercive pressure" is particularly concerning in the public school context). The bulk of the coercion cases—in the Fourth Circuit and beyond—demonstrate that context is key. These cases require an atmosphere that renders the plaintiff "particularly susceptible to the religious indoctrination or peer pressure" of the governmental actor. Hewett v. City of King, 29 F. Supp. 3d 584, 638 (M.D.N.C. 2014); see Mellen v. Bunting, 327 F.3d 355, 371-72 (4th Cir. 2003).

The Supreme Court's coercion doctrine prior to Town of Greece has developed largely in several cases involving school children. E.g. Lee, 505 U.S. at 586-87, 112 S. Ct. at 2655; Santa Fe, 530 U.S. at 311-12, 120 S. Ct. at 2280-81;  Engel, 370 U.S. at 424, 82 S. Ct. at 1263-64; c.f. Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 224, 83 S. Ct. 1560, 1572, 10 L. Ed. 2d 844 (1963) (holding state laws requiring reading of bible verses and recitation of the Lord's Prayer as unconstitutional under the First Amendment because the laws "require[d] religious exercises"). See generally Mellen, 327 F.3d at 366-368 (summarizing and discussing Supreme Court decisions involving prayers in public school settings).  The two seminal cases in the Supreme Court's coercion jurisprudence are Lee and Santa Fe, both of which involved prayers at public school events. In Lee, the Supreme Court emphasized the public school context in finding that the school's practice of selecting a member of the clergy to deliver a prayer at high school graduations was unconstitutionally coercive. Lee, 505 U.S. at 597, 112 S. Ct. at 2660-61. The Supreme Court distinguished the high school graduation prayer from the legislative prayers

33

in <u>Marsh</u>, noting that <u>Marsh</u> concerned adults who were free to come and go during a state legislature's opening session. The <u>Lee</u> court highlighted the significance of high school graduation in a student's life, characterizing "[t]he influence and force of a formal exercise in a school graduation are far grater than the prayer exercise we condoned in <u>Marsh</u>."

In <u>Santa Fe</u>, the Supreme Court found the practice of a high school in opening its football games with a student-led prayer was an unconstitutionally coercive practice in violation of the Establishment Clause. <u>Santa Fe</u>, 530 U.S. at 310-11, 120 S. Ct. at 2279-80. Even though attendance at the football games was not mandatory, the Supreme Court observed that for students involved in extracurricular activities like cheerleading or the football team, attendance was effectively required. <u>Id.</u> at 311, 120 S. Ct. at 2280. "Even if we regard every high school student's decision to attend a home football game as purely voluntary, we are nevertheless persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship." <u>Id.</u> at 312, 120 S. Ct. at 2280. In holding as such, the Supreme Court recognized the difficult choice students would be presented with if they had to choose between not attending the games or to attend and be submitted to a "personally offensive religious ritual." <u>Id.</u>

The school setting and impressionability of youth were important factors in the Supreme Court's decisions in <u>Lee</u> and <u>Santa Fe</u>. However, the Supreme Court nowhere suggested that coercion could not occur with an adult audience. Indeed, the plurality in <u>Town of Greece</u> admits that coercion could occur specifically in the legislative prayer context. Moreover, the Fourth Circuit has explicitly included adults as being susceptible to unconstitutionally coercive

34

state practices. In <u>Mellen v. Bunting</u>, the Fourth Circuit found that a the Virginia Military Institute's ("VMI") practice of holding a supper prayer six nights a week violated the Establishment Clause as an unconstitututionally coercive practice. The supper prayer was delivered once cadets were in formation, and the cadets were required to stand still and remain silent while the prayer was delivered, although the cadets were "not obliged to recite the prayer, close their eyes, or bow their heads." <u>Mellen</u>, 327 F.3d at 362. The Fourth Circuit ascribed great significance to VMI's "adversative method" of instruction which created a "coercive atmosphere." <u>Id.</u> at 371. The technically voluntary nature of the supper prayer did not prevent a finding of coercion. <u>Id.</u> at 372. Instead, given the context of the prayer and the coercive atmosphere, the Fourth Circuit held "the Establishment Clause precludes school officials from sponsoring an official prayer, even for mature adults." <u>Id.</u> at 371-72. Other courts have also acknowledged the applicability of coercion analysis beyond the school context or child plaintiffs. <u>E.g.</u> <u>DeStefano v. Emergency Hous. Group, Inc.</u>, 247 F.3d 397, 413 (2d Cir. 2001) (observing tenets of Supreme Court coercion would apply to state-sponsored religiously-imbued alcoholism treatment program without non-religious alternative, even if the program was technically voluntary); <u>Kerr v. Farrey</u>, 95 F.3d 472, 476-480 (7th Cir. 1996) (finding an inmate's mandatory participation in Narcotics Anonymous, which included religious exercises, to be unconstitutionally coercive under the Establishment Clause); <u>Marrero-Méndez v. Pesquera</u>, No. 13-1203, 2014 U.S. Dist. LEXIS 116118, at *8-10 (D.P.R. Aug. 19, 2014) (applying <u>Lee</u> and coercion doctrine to claim of coercive prayer practice brought by police officer against supervisor); <u>Gray v. Johnson</u>, 436 F. Supp. 2d 795, 799-800 & n.4, (W.D. Va. 2006) (considering

35

whether inmate was coerced within <u>Lemon</u> framework, noting that a coercive practice would fail <u>Lemon</u>'s effects prong).

In one of its more recent coercion decisions, the Fourth Circuit conceptualized the coercion inquiry as involving two factors. First, the court "looks to the context in which the assertedly coerced activity occurs," and second, the court considers "the character of the activity itself." <u>see</u> <u>Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.</u>, 373 F.3d 589, 598 (4th Cir. 2004). In the prison context, other Circuits have employed a similar, three-part test derived from <u>Lee</u> which looks to whether the state acted, whether the action was coercive, and whether the coercion was religious in nature. <u>See</u> <u>Kerr</u>, 95 F.3d at 479; <u>Jackson v. Nixon</u>, 747 F.3d 537, 542 (8th Cir. 2014); <u>Inouye v. Kemna</u>, 504 F.3d 705, 713 (9th Cir. 2007); <u>see also</u> <u>Marrero-Méndez</u>, 2014 U.S. Dist. LEXIS 116118, at * 8-10, (using three-part coercion test where police officers engaged in closing prayer and atheist officer was not allowed to leave, was isolated from the rest of the officers, and was verbally humiliated by supervisor).

These tests are particularly useful given the fact-specific nature of Establishment Clause cases, as well as the lack of consensus from the Supreme Court in <u>Town of Greece</u> as to the appropriate coercion inquiry in a legislative prayer case. Moreover, the Court observes that the <u>Town of Greece</u> plurality structured its coercion analysis around similar factors to the Fourth Circuit's, identifying the inquiry as fact-intensive and focused on that "both the setting in which the prayer arises and the audience to whom it is directed." <u>Town of Greece</u>, 134 S. Ct. at 1825 (plurality opinion). Applying the Fourth Circuit's factors from <u>Child Evangelism Fellowship of Maryland, Inc.</u> here, while cognizant of the greater background of coercion cases and

36

principles, directs a finding that Defendant's prayer practice is coercive. The context in the present case is one in which the government, through elected, policymaking officials, engages in a religious exercise (almost exclusively representing one faith) directly before making decisions on public matters and addressing the concerns of county citizens and residents. The character of the particular coerced activity is that of the government asking for public participation in a prayer exercise, so that non-adherents in the majority faith must either acquiesce to the exercise or effectively brand themselves as outsiders by not following along. See Child Evangelism Fellowship of Md, Inc, 373 F.3d at 599 (identifying situations in which the coerced activity constituted unconstitutional coercion because of its inherently religious nature, including being "bound to sit by while other students or faculty pray," and being "required, or even encouraged, to accept a religious tract, or asked to read or listen to a religious message"); see also Peck v. Upshur Cnty. Bd. of Educ., 155 F.3d 274, 287 (4th Cir. 1998) (" 'The inquiry with respect to coercion must be whether the *government* imposes pressure upon a student to participate in a religious activity.' " (quoting Bd. of Educ. v. Mergens, 496 U.S. 226, 261, 110 S. Ct. 2356, 2378, 110 L. Ed. 2d 191 (1990) (Kennedy, J., concurring in part and concurring in the judgment))).

Even when looking beyond the Child Evangelism Fellowship of Maryland, Inc factors to the broader themes of coercion captured in coercion cases, the practices here indeed appear to fall within those generally unconstitutional practices. Certainly "subtle coercive pressures" deprive attendees of a "real choice" as to whether to participate in the prayer practice by standing along with the majority of the public and the Commissioners. See Lee, 505 U.S. at 592, 595, 112 S. Ct. at 2658-59; see also DeStefano, 247 F.3d at 412 (observing in context of adults

that "Government and those funded by government 'may no more use social pressure to enforce orthodoxy than [they] may use more direct means.' " (quoting <u>Lee</u>, 505 U.S. at 594, 112 S. Ct. at 2659)). While attendance at Board meetings is of course not mandatory, for concerned citizens wishing to advocate for matters of local import with direct impact on local citizens' lives, attendance and maintaining the Board's respect are of utmost importance. When Plaintiffs wish to advocate for local issues in front of the Board, they should not be faced with the choice between staying seated and unobservant, or acquiescing to the prayer practice of the Board, as joined by most, if not all, of the remaining public in attendance.

Defendant argues that "hurt feelings" do not prove that a practice is unconstitutionally coercive, citing to the <u>Town of Greece</u> plurality's statement that "[o]ffense, however, does not equate to coercion." <u>Town of Greece</u>, 134 S. Ct. at 1826 (plurality opinion). As Plaintiffs note, Defendant in essence argues for a heightened showing for coercion, stating that Plaintiffs never alleged or proved that they suffered penalties for failing to comply with a request to stand and pray. The plurality in <u>Town of Greece</u> required no such showing, and coercion jurisprudence before <u>Town of Greece</u> likewise does not demand such a showing. Moreover, Plaintiffs have attested to much more than "hurt feelings" as argued by Defendant, in that each Plaintiff attested to feeling compelled and coerced to participate in the prayers so as not to diminish their community standing and ability to be effective advocates.

As past coercion cases and the <u>Town of Greece</u> plurality emphasize, context is key in Establishment Clause violations involving coercive practices. Here, the Board's legislative prayer practice leads to prayers adhering to the faiths of five elected Commissioners. The Board

38

maintains exclusive and complete control over the content of the prayers, and only the Commissioners deliver the prayers. In turn, the Commissioners ask everyone—including the audience—to stand and join in what almost always is a Christian prayer. On the whole, these details and context establish that Defendant's prayer practice is an unconstitutionally coercive practice in violation of the Establishment Clause. The practice "sends the . . . message to members of the audience who are nonadherents 'that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" Santa Fe, 530 U.S. at 309-310, 120 S. Ct. at 2279 (quoting Lynch v. Donnelly, 465 U.S. 668, 688, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring)). The Board's practice contravenes the Establishment Clause by dividing along religious lines and exacting coercive pressure on nonadherents to conform to the majority-represented faith. Nonadherents, such as Plaintiffs, would feel pressured to conform so as to not diminish their political clout or social standing. "When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." Engel v. Vitale, 370 U.S. 421, 430-431, 82 S. Ct. 1261, 1267, 8 L. Ed. 2d 601 (1962); see Hudson, 2014 U.S. Dist. LEXIS 106401, at *6 ("[T]he prayer practice in Pittsylvania County had the unconstitutional effect, over time, of officially advancing one faith or belief, violating 'the clearest command of the Establishment Clause . . . that one religious denomination cannot be officially preferred over another.'" (quoting Larson v. Valente, 456 U.S. 228, 244, 102 S. Ct. 1673, 72 L. Ed. 2d 33 (1982)). The Court, therefore, finds that Defendant's prayer

practice, in directing the public to stand and pray, violates the bedrock principles of the Establishment Clause, in that it serves as an unconstitutionally coercive practice.

## IV. CONCLUSION

It is the Court's conclusion that Defendant's practice does not fit within the long history and tradition of legislative prayer condoned in <u>Marsh</u> and <u>Town of Greece</u>. As noted herein, key distinctions, including that Commissioners themselves are the sole prayer-writers and prayer-givers, distinguish Defendant's practice from that at issue in <u>Town of Greece</u>. In turn, considering the persuasive weight of the <u>Town of Greece</u>'s plurality opinion and the general principles of past coercion cases, Defendant's practice is unconstitutionally coercive in violation of the Establishment Clause of the United States Constitution.[10] As the Supreme Court reiterated in <u>Town of Greece</u>, "[o]ur Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior." 134 S. Ct. at 1822 (citing <u>Engel</u>, 370 U.S. at 430, 82 S. Ct. at 1266, 8 L. Ed. 2d 601 (1962). The practice of the Board is much more similar to this prohibited activity than it is to the inclusive, non-discriminatory, and non-coercive practice of the <u>Town of Greece</u> in inviting volunteers to deliver legislative prayers. The Court finds that the Board's practice violates the Establishment Clause for the reasons more fully discussed above. In turn, Plaintiffs are entitled to judgment as a matter of law.

Accordingly, the Court will deny Defendant's Motion for Summary Judgment [Doc. #51]

---

[10] In their Verified Complaint, Plaintiffs also claimed Defendant's practice violated the North Carolina Constitution. Because the Court finds that Defendant's prayer practice violates the United States Constitution, the Court need not address this claim.

and grant Plaintiffs' Motion for Summary Judgment [#52]. As such, the Court will replace its preliminary injunction against sectarian prayer with a permanent injunction enjoining Defendant Rowan County from engaging in the prayer practice described above, under which Commissioners and only Commissioners provide the prayers and Commissioners direct citizens to stand and pray along with the Commissioners. The Court further concludes that Plaintiffs may pursue attorney's fees and costs from Defendant under 42 U.S.C. § 1988 pursuant to the procedure set out in Local Rule 54.2.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment [Doc. #52] is GRANTED. IT IS DECLARED that Defendant's invocation practice violates the Establishment Clause of the United States Constitution, and Defendant is ENJOINED from continuing its practice as discussed above. IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment [Doc. 51] is DENIED. FINALLY, IT IS ORDERED that Plaintiffs be awarded $1.00 in nominal damages as requested in their Verified Complaint, and that Plaintiffs may pursue attorney's fees and costs under 42 U.S.C. § 1988, pursuant to the procedure set out in Local Rule 54.2.

This, the 4th day of May, 2015.

United States District Judge